UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
                                                                 :
HENRY A. WAXMAN and METROPOLITAN                                 :
MINING COMPANY, INC.,                                            :
                                                                 :
                              Plaintiffs,                        :
                                                                 :                02 Civ. 10132 (GEL)
                 -v-                                             :
                                                                 :        **OPINION AND ORDER**
ENVIPCO PICK UP & PROCESSING                                     :
SERVICES, INC., ENVIRONMENTAL                                    :
PRODUCTS CORPORATION, INC., ENVIPCO                              :
HOLDING, N.V., BHAJUN SANTCHURN and                              :
JOHN DOES 1-10,                                                  :
                                                                 :
                              Defendants.                        :
                                                                 :
-----------------------------------------------------------------x

Eugene Killian, Killian & Salisbury, P.C., for
Plaintiffs.

Jeffrey W. Herrmann, McGuireWoods LLP, for
Defendants Envipco Pick Up & Processing Services
Inc., Environmental Products Corp., and Envipco
Holding, N.V.


GERARD E. LYNCH, District Judge:

       Defendants Envipco Pick Up & Processing Services, Inc. ("EPPSI"), Environmental

Products Corp. ("EPC"), and Envipco Holding, N.V. (collectively, "Envipco"), move for partial

summary judgment on various statutory and contractual claims asserted by plaintiffs Henry A.

Waxman and Metropolitan Mining Company, Inc. ("MetroMining"), and on defendants'

conversion and unjust enrichment counterclaims. Plaintiffs cross-move for partial summary

judgment as to defendants' liability for breach of contract. The claims and counterclaims in this

case arise from the acquisition of MetroMining by EPPSI in late 2001. For the following

reasons, defendants' motion will be granted in part and denied in part, and plaintiffs' motion will be granted.

## BACKGROUND

Waxman was President and sole shareholder of MetroMining, a New York corporation that provided various services to beverage distributors and retailers, including facilitating distributors' reimbursement of container-return fees paid by retailers to consumers. (Pl. Statement of Material Facts ¶ 1 ["Pl. Statement"]; Herrmann Decl., Ex. A, Waxman Dep. at 97-98.) Defendant Envipco Holding, a publicly-traded Dutch corporation, wholly owns defendants EPPSI and EPC, U.S. corporations organized under the laws of Delaware. (Pl. Statement ¶¶ 2, 4.)

In early 2001, Waxman entered into negotiations with defendant Bhajun Santchurn, Envipco Holding's CEO (and controlling shareholder of Envipco Holding, EPPSI, and EPC), concerning a potential sale of MetroMining to EPPSI. (Id. ¶ 6.) That sale was finalized and an Asset Sale and Purchase Agreement ("Sale Agreement") was executed by Waxman and an EPPSI representative in late 2001. (Herrmann Decl., Ex. D., Sale Agreement, at 30.) Waxman also signed a General Assignment and Bill of Sale ("Bill of Sale"), which states, inter alia, that MetroMining "has granted, conveyed, assigned, transferred and set over . . . to [EPPSI] all of its right, title, interest" in the assets of MetroMining that the Sale Agreement describes as being acquired by EPPSI. (Pl. Statement ¶ 19; Herrmann Decl., Ex. F, Bill of Sale at 1.) At approximately the same time, Waxman and Santchurn executed an Employment Agreement whereby Waxman would be employed by EPC as a manager for an initial 180-day term, at an annual salary of $90,000, with the opportunity to extend that term "on terms and conditions to be

agreed to by the parties." (Id., Ex. E., Employment Agreement §§ 7.2-.3; Pl. Statement ¶¶ 16-17.) On or about October 28, 2001 ("Closing Date"), the sale of MetroMining to EPPSI closed. (Bill of Sale at 3; Waxman Decl. ¶¶ 3, 8(a); Waxman Dep. at 28.)

Payment for MetroMining's assets was to be made in the form of 550,000 depositary receipts representing shares of Envipco Holding stock. Depositary receipts are securities, "tradeable in the United States, which represent shares of foreign stock," Schreiber Family Charitable Found. v. First Fin. Acceptance Co., 965 F. Supp. 397, 398 (E.D.N.Y. 1997) – in this case, the stock of Envipco Holding, whose shares trade only on the Belgian "EuroNext" Exchange. (Sale Agreement § 2.2(a); Def. Mem. at 3.) The Sale Agreement also provided that in exchange for the Employment Agreement signed by Waxman, Waxman would receive an additional 50,000 Envipco Holding depositary receipts. (Sale Agreement § 2.2(a).) Under the Sale Agreement, neither MetroMining nor Waxman could transfer the depositary receipts for a period of two years following the closing date without the written consent of Envipco Holding. (Id. § 7.7.)

It is undisputed that plaintiffs transferred MetroMining's assets to EPPSI in October 2001. (Pl. Mem. at 4; Waxman Decl. ¶ 3.) It is also undisputed that defendants *failed* to transfer the 550,000 depositary receipts due in exchange. (Def. Mem. at 10.) In a letter dated October 28, 2001, Santchurn wrote to MetroMining indicating that the 550,000 depositary receipts would be transferred by January 28, 2002, approximately 90 days after the Closing. (Waxman Decl., Ex. D., at 1.) Waxman claims that in March 2002, he complained to Envipco that the receipts were never transferred, (Pl. Mem at 5), and in response he was forwarded a September 19, 2001, email apparently from Envipco Holding's lawyers to other Envipco personnel explaining that

Dutch law prohibited the transfer of depositary receipts as contemplated by the Agreement, and that the Agreement would have to be restructured. (Waxman Decl., Ex. E., at 1-2.) That restructuring never occurred, and to date, the 550,000 receipts due in exchange for the sale of MetroMining to EPPSI have not been transferred.[1]

While defendants failed to transfer the depositary receipts, they complain that plaintiffs unlawfully detained and used certain MetroMining funds that were transferred to EPPSI under the Sale Agreement. Prior to the sale of MetroMining to EPPSI, MetroMining's cash was held in four accounts at JP Morgan Chase Bank ("the JP Morgan accounts"). (Def. Mem. at 5; Pl. Mem. at 9-12; Waxman Decl. ¶ 8, Pl. Statement ¶ 21.) Under the Sale Agreement, this cash, as well as any amounts due to MetroMining on the date of the Closing, was to be transferred to EPPSI. (Sale Agreement § 1.1(a), (j).) The transfer of MetroMining's cash was, however, subject to certain conditions. Specifically:

> Amounts due after the Closing with respect to (i) trade payables under vendor agreements, supply agreements and other commitments, obligations for the supply of electric power, gas, water, sewage disposal services or similar utilities associated with the facilities used by MetroMining in connection with the Business (the "*Trade Payables*"); and (ii) deposits payable owing at or prior to Closing by MetroMining to retailers and held in trust for that purpose ("*Deposits Payable*") (the Trade Payables and the Deposits Payable collectively being referred to as the "*Payables*") shall be paid by Envipco using (i) the Cash and Cash Equivalents and (ii) those Receivables actually collected by Envipco following the Closing Date.

---

[1] While defendants concede that they failed to transfer the 550,000 receipts due in exchange for the sale of MetroMining, they assert that on December 19, 2003, they transferred to Waxman the 50,000 depositary receipts due in exchange for the Employment Agreement. (Def. Mem. 10; Herrmann Decl., Ex. I, at 1; Waxman Dep. at 71-72.) Waxman disputes the effectiveness of the transfer of these receipts. (Waxman Dep. at 51, 72; Pl. Mem. at 5.) The transfer of the 50,000 receipts is not at issue on this motion.

(Sale Agreement § 1.2(a) (emphasis in original).) Defendants concede that EPPSI was required to first use the cash it acquired from MetroMining, as well as the proceeds of MetroMining's accounts receivable, for the payment of these amounts. (Def. Mem. at 6.)

After the Closing (and despite the fact that EPPSI had not yet transferred the 550,000 depositary receipts), while the four JP Morgan accounts remained in MetroMining's name, EPPSI began using them as its own. (Pl. Mem. at 6; Waxman Decl. ¶ 7(c).) While it is not entirely clear whether EPPSI was ever granted the ability to access these accounts itself, it does appear that deposits representing payments to EPPSI were made into the accounts (Waxman Dep. at 93-94), and that withdrawals to cover costs incurred by EPPSI were made from the accounts (Herrmann Decl., Ex. K., at 1-2; Waxman Decl. ¶ 7(c)).[2] Defendants state, without objection, that "[i]n this unusual arrangement, for several months EPPSI used the old bank accounts of Metro Mining to receive payments and write checks," and they also claim that during this period, "Metro Mining was in effect a bailee of EPPSI's cash." (Def. Mem. at 7.)

Soon after the Closing, relations between Waxman and Envipco soured. In addition to EPPSI's failure to transfer the depositary receipts, Waxman claims that MetroMining's cash was not being used to pay off its creditors as specified in the Sale Agreement. (Pl. Mem. at 6, 9; Waxman Decl. ¶ 7(b)-(d); Waxman Dep. 105-07, 111; Herrmann Decl., Ex. K., at 1-2.) Waxman also complains that he was required to use MetroMining's funds to pay off various expenses incurred by EPPSI. (Herrmann Decl., Ex. K, at 1-2; Waxman Dep. at 86-88.) Additionally, there was friction on the job at EPC, culminating in a heated exchange between

---

[2] Waxman argues that EPPSI was able to and did access the funds in the JP Morgan accounts by utilizing checks pre-printed with Waxman's signature and a rubber stamp facsimile of Waxman's signature. (Waxman Decl. ¶ 7(c); Waxman Dep. at 100-01.)

Waxman and Envipco executive Charles Rigby, after which Waxman believed he had been fired, and after which he was excluded from certain Envipco facilities. (Waxman Dep. at 112-15; Waxman Decl. ¶ 7(f).)

The next day, on March 21, 2002, Waxman personally directed JP Morgan to "lock out" anyone other than himself from the JP Morgan accounts. (Waxman Dep. at 115-121.) He memorialized this action in a letter requesting JP Morgan to:

> "lockout" if that is the correct phrase, all of MetroMining's accounts effective immediately. By that I mean deposits to any of my accounts will of course be allowed, but there shall be no withdrawals or transfers without my personal, expressed permission.

(Hermann Decl., Ex. J.) Defendants subsequently requested that Waxman turn over the funds in these accounts, but Waxman refused. (Pl. Statement ¶ 29.) Instead, Waxman used the remaining funds in these accounts[3] to pay a variety of allegedly "legitimate expenses that Envipco was contractually obligated to satisfy under [the Sale Agreement] but naturally did not." (Waxman Decl. ¶ 8.) Among other things, Waxman used over $130,000 to pay various attorneys' fees incurred by MetroMining. (Id. ¶ 8(c)-(e).)

Plaintiff then filed this action, which focuses on defendants' failure to transfer the depositary receipts due under the Sale Agreement (including the 50,000 receipts due in exchange for the Employment Agreement), alleging that defendants violated the federal securities laws, committed fraud and other torts, and breached the parties' contract. Defendants moved to

---

[3] While the parties are not in agreement as to the amount of funds in the JP Morgan accounts as of March 21, 2002, Waxman claimed in his deposition that he "learned what the total balances were in all the Metro accounts after March 21," and that a rough estimate was "240, $243,000." (Waxman Dep. at 120-21.) Defendants are willing to stipulate that the amount in the JP Morgan accounts is $243,000. (Def. Mem. 1 n.1.)

dismiss the federal securities law and tort claims asserted in the complaint, and in an Opinion

and Order entered on October 28, 2003, that motion was granted. See Waxman v. Envipco Pick

Up & Processing Servs., Inc., No. 02 Civ. 10132, 2003 WL 22439796 (S.D.N.Y. Oct. 28, 2003).

Plaintiffs subsequently amended their complaint, adding certain statutory and contractual causes

of action, and defendants filed an answer which, inter alia, asserted conversion and unjust

enrichment counterclaims relating to Waxman's detention and use of the funds in the JP Morgan

accounts. After the close of discovery, both parties moved for partial summary judgment.

Defendants move for summary judgment on the question of plaintiffs' entitlement to restitution

damages on its breach-of-contract claim, on plaintiffs' remaining claims, and on defendants'

conversion and unjust enrichment counterclaims.[4] Plaintiffs cross-move for summary judgment

as to defendants' liability for breach of contract, to the extent of the 550,000 receipts due in

exchange for the sale of MetroMining to EPPSI.

## DISCUSSION

Summary judgment is proper if "there is no genuine issue as to any material fact" and

"the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine

issue of material fact exists if the evidence is such that a reasonable jury could find in favor of

the non-moving party. Holtz v. Rockefeller & Co., 258 F.3d 62, 69 (2d Cir. 2001). In deciding a

summary judgment motion, the Court must "resolve all ambiguities and draw all reasonable

---

[4] This Court previously granted defendants' motion to dismiss plaintiffs' unjust
enrichment claim, which was based on defendants' failure to compensate plaintiffs for the sale of
MetroMining's assets and the Employment Agreement. (First Amended Complaint ¶ 71.) See
Waxman, 2003 WL 22439796, at *11-*12. The Second Amended Complaint, filed after the
Court ruled on defendants' motion to dismiss, reasserts this claim with no alteration. This
appears to be an oversight on plaintiffs' part. For the reasons stated in the Court's October 28,
2003 Opinion and Order, the unjust enrichment claim is dismissed.

inferences in the light most favorable to the party opposing the motion." Cifarelli v. Babylon, 93 F.3d 47, 51 (2d Cir. 1996). Under New York law, which applies in this case, when interpreting the provisions of a contract, summary judgment is inappropriate "when the meaning of the contract is ambiguous and the intent of the parties becomes a matter of inquiry." Postlewaite v. McGraw-Hill, Inc., 411 F.3d 63, 67 (2d Cir. 2005) (quotation marks omitted).[5]

I. Defendants' Motion for Partial Summary Judgment

       Defendants' primary claim is directed to plaintiffs' request for "rescission" of the Sale Agreement, or more precisely, restitution damages for defendants' breach of contract. "Contract damages are ordinarily based on the injured party's expectation interest and are intended to give him the benefit of his bargain by awarding him a sum of money that will, to the extent possible, put him in as good a position as he would have been in had the contract been performed." Restatement (Second) of Contracts § 347 cmt. a (1981). Under certain circumstances, however, a plaintiff may be entitled to elect between damages representing the benefit of the bargain made – expectation damages – and damages representing an undoing of the bargain altogether – restitution damages.

       Under the latter measure of damages, the plaintiff does not receive "the loss in the value to him of the other party's performance," id. § 347(a), but rather receives the value of the benefit conferred to the other party, see Bausch & Lomb, Inc. v. Bressler, 977 F.2d 720 (2d Cir. 1992); Restatement § 344(c). Because a restitution award does not seek to provide the plaintiff with

---

[5] In their reply memorandum, defendants argue that because plaintiffs had not, up to that point, submitted a Statement of Material Facts in accordance with this Court's Local Rule 56.1, defendants' version of the facts should be deemed admitted. (Reply Mem. at 2-3.) The Court declines to adopt this technical argument. Although it was not timely filed, plaintiffs eventually filed a Statement subsequent to the filing of defendants' reply.

what was due to him under the contract, but rather seeks to restore "the reasonable value of any benefit conferred upon the defendant by the plaintiff," "it is not governed by the terms of the parties' agreement." Bausch & Lomb, 977 F.2d at 730.  Thus, even though the price that the defendant was to pay plaintiff for its performance "may provide probative evidence of the value of the benefit" received, "the reasonable value of the benefit unjustly received, not the contract price, determines the amount of an award in restitution." Id.  Here, plaintiffs seek in restitution the "reasonable value" of MetroMining, which they estimate at $1,500,000 (Second Amended Complaint ¶¶ 17-18; Pl. Mem. at 12), rather than the value of the 550,000 depositary receipts that EPPSI was to pay for MetroMining under the Sale Agreement.  Both parties operate under the assumption that an award of $1,500,000 would be in excess of the value of those depositary receipts.  (Pl. Mem. at 12-13; Def. Mem. at 19.)[6]

The decision whether to award restitution damages lies within the discretion of the trial court.  See Rudman v. Cowles Comms., Inc., 30 N.Y.2d 1, 13-14 (1971) (holding plaintiff not entitled to rescission of contract and restitution – "[s]uch relief, lying in equity, is a matter of discretion," and "is to be invoked only when there is lacking complete and adequate remedy at law"); Tech. Exp., Inc. v. FTF Bus. Sys. Corp., No. 99 Civ. 11692, 2000 WL 1877020, at *6 (S.D.N.Y. Dec. 26, 2000) (noting that to recover in restitution, plaintiff must show "that the circumstances were such that equity and good conscience require defendant to make restitution"); cf. Libutti v. United States, 178 F.3d 114, 121 (2d Cir. 1999) (holding in unrelated context that "whether a party is entitled to the equitable remedy of restitution is a discretionary

---

[6]  It should be noted that plaintiffs do not request that the Court order the restitution of MetroMining's assets themselves.  The parties appear to agree that such relief would be impossible because MetroMining has been assimilated into EPPSI's operations.

matter for a trial court"); United States v. Bedford Assocs., 713 F.2d 895, 902 (2d Cir. 1983)

("Restitution is an equitable remedy resting in the sound discretion of the trial court."). In this

instance, such damages are unwarranted.

As an initial matter, "[u]nder New York law, the normal measure of damages for breach

of contract is expectation damages." McKinley Allsopp, Inc. v. Jetborne Intern., Inc., No. 89

Civ. 1489, 1990 WL 138959, at *8 (S.D.N.Y. Sept. 18, 1990) (Leval, J.); see also 24 Richard A.

Lord, Williston on Contracts § 64:2 (4th ed. 2002) [hereinafter "Williston"] ("[C]ontract

damages are ordinarily calculated based on protection of the disappointed promisee's

expectation interest and are designed to secure for that party the benefit of the bargain that he or

she made . . . ."); Restatement § 347 cmt. a ("Contract damages are ordinarily based on the

injured party's expectation interest . . . ."). There is a sound basis for this general rule:

> A promisee enters into a particular contract because he or she
> wants a particular outcome and believes that the best possible
> outcome, under the circumstances, will be achieved by contracting
> with this particular promisor. When the promisor fails to perform
> as promised, the promisee becomes entitled to damages designed
> to compensate him or her for the harm caused by the breach. That
> harm, in turn, is the loss suffered by the promisee when the
> promisor failed to perform his or her promise – in other words, the
> value to the promisee of the promise that was broken. There are,
> of course, any number of ways to measure that harm or determine
> the value of the unperformed, broken promise, but the best
> measure of the value of the broken promise is the value assigned to
> it by the parties themselves. Not only does this represent the
> promisee's assessment of the value, thereby indicating its
> importance to him or her, but absent an invalidating cause such as
> mistake, duress, or the like, the promisor cannot complain that the
> value alleged is unreasonable or otherwise invalid. In short, basing
> damages on an amount equal to what the promisor and, especially,
> the promisee, believed the promise to be worth, reflects better than
> any other measure the loss caused by the breach, and since this
> amount is precisely what the parties sought as a result of their
> bargain – that is, what the parties expected their contract to yield –

damages based on protection of the promisee's expectation interest are not only the most accurate means of measuring loss following a breach of contract but also the most typical measure of recovery granted.

24 Williston § 64:2.

Plaintiffs provide no good reason why the Court should deviate from this general rule here. Even assuming that EPPSI knowingly and willfully breached the contract in the ways spelled out by plaintiffs (Pl. Mem. at 12-17), plaintiffs ask the Court to remedy the situation by granting them not the value of MetroMining as determined by the parties in their contract negotiations, but the value of MetroMining as determined through, presumably, a battle of the experts. This will inevitably lead to a less fair result, and potentially to a windfall for plaintiffs. See Miller v. Robertson, 266 U.S. 243 (1924) (noting plaintiff in breach-of-contract action "not entitled to be put in a better position by the recovery than if [defendants] had fully performed the contract"); Baker v. Drake, 53 N.Y. 211 (1873) ("If the broker has violated his contract, or disposed of the stock without authority, the customer is entitled to recover such damages as would naturally be sustained in restoring himself to the position of which he has been deprived. He certainly has no right to be placed in a better position than he would be in if the wrong had not been done."); Hansen Bancorp, Inc. v. United States, 367 F.3d 1297, 1315 (Fed. Cir. 2004) (noting restitution damages may be inappropriate where "relief would result in an 'unfair windfall' to the non-breaching party").

Finally, even assuming that EPPSI's failure to transfer the 550,000 depositary receipts was a "total breach" of its obligations in connection with the sale of MetroMining, see Abdul v. Subbiah, 735 N.Y.S.2d 29, 30 (1st Dep't 2001) ("Since the breach of contract by non-performance was a total breach, plaintiff was entitled to obtain restitution." (citing, inter

alia, Restatement § 373(1))), plaintiffs do not claim that at the time of EPPSI's alleged breach any outstanding performance on *plaintiffs*' part remained due. Thus, all that remained was for EPPSI to transfer a fixed sum of securities whose value on any particular date is easily determined. The Restatement indicates that in such cases, damages in excess of the contract price are inappropriate, even in the case of a "total breach" of a contract. See Restatement § 373(2), cmt. b. Specifically, comment b to section 373 states that:

> If, after one party has fully performed his part of the contract, the other party then refuses to pay a definite sum of money that has been fixed as the price for that performance, the injured party is barred from recovery of a greater sum as restitution . . . . Since he is entitled to recover the price in full together with interest, he has a remedy that protects his expectation interest by giving him the very thing that he was promised. Even if he asserts that the benefit he conferred on the other party exceeds the price fixed by the contract, justice does not require that he have the right to recover this larger sum in restitution. To give him that right would impose on the court the burden of measuring the benefit in terms of money in spite of the fact that this has already been done by the parties themselves when they made their contract.

That reasoning applies here.

In short, the Court will not allow plaintiffs, through an action for restitution damages, to renegotiate the price for MetroMining agreed to by the parties in the Sale Agreement. Thus, on plaintiffs' breach-of-contract claim, damages will be measured in terms of plaintiffs' expectation interest, that is:

> (a) the loss in the value to [the plaintiff] of [the defendant's] performance caused by [defendant's failure to perform its obligations under the Agreement], plus
>
> (b) any other loss, including incidental or consequential loss, caused by the breach, less
>
> (c) any cost or other loss that [plaintiff has] avoided by not having

12

to perform.

Restatement § 347.  In all other respects, plaintiffs' breach-of-contract claim is uncontested by defendants, and may proceed.

However, plaintiffs' remaining claims for relief will be dismissed.  Plaintiffs' first claim for relief, entitled "Failure of Consideration," and fourth claim for relief, asserting a violation of the implied covenant of good faith and fair dealing, will be dismissed as duplicative of plaintiffs' breach-of-contract claim.  See N.Y.U. v. Continental Ins. Co., 87 N.Y.2d 308, 320 (1995) (dismissing implied covenant claim duplicative of express breach of contract claim).  Plaintiffs allege under the "Failure of Consideration" heading that the transfer of the depositary receipts was "material consideration" for the contract, that the failure to transfer the receipts in a timely fashion "deprived the Plaintiffs of the benefit of their bargain," and that "[a]s a result of this failure of consideration, Plaintiffs have the right to rescind the Agreement[] and reclaim the value transferred to the Envipco Parties." (Compl. ¶¶ 61-62.)  There is no difference between this claim and the breach-of-contract claim; under both headings, plaintiffs claim that defendants breached the Sale Agreement by failing to transfer the depositary receipts, and that plaintiffs are entitled to rescission and restitution damages on account of that breach.

As for the implied covenant claim, plaintiffs assert that the failure to transfer the depositary receipts due not only violated the express terms of the Agreement, but also violated the implied covenant of good faith and fair dealing.  Plaintiffs argue that the implied covenant claim is not duplicative of the breach-of-contract claim, primarily because the breach-of-contract claim focuses on the actual failure to transfer the depositary receipts, while the implied covenant claim focuses on defendants' knowledge, prior to the consummation of the Agreement, that

Dutch law prohibited the transfer of the receipts as set out therein.  (Pl. Mem. at 19-20.)

However, even if the facts emphasized under each claim differ, what is ultimately at issue in

both claims is defendants' failure to transfer, and plaintiffs' inability to obtain, the depository

receipts, and the damages resulting to plaintiffs from this breach.  Thus, "the predicate conduct

for the claims is the same, despite the attempt to emphasize different aspects of the conduct in

the implied covenant claim."  <u>Concesionaria DHM, S.A. v. Int'l Fin. Corp.</u>, 307 F. Supp. 2d 553,

564-65 (S.D.N.Y. 2004) (dismissing implied covenant claim based on failure to provide timely

notice of intention to breach contract where breach of contract claim was asserted for actual

breach); <u>W.S.A. Inc. v. ACA Corp.</u>, Nos. 94 Civ. 1868, 94 Civ. 1493, 1996 WL 551599, at *9

(S.D.N.Y. Sept. 27, 1996) (dismissing implied covenant claim and noting that "[t]he fact that

[plaintiff] has bifurcated its breach of contract claim, so as to place some of the allegations in

support thereof in the category of 'breach of contract of fair dealing,' does not grant it two

separate causes of action").[7]

That leaves plaintiffs' second claim for relief, which is that even if plaintiffs are not

otherwise entitled to restitution damages, under N.Y. U.C.C. § 8-307, defendants' failure to issue

and transfer the depository receipts due under the Agreement within a reasonable amount of time

permits plaintiffs to "reject or rescind" the Agreement (and thus seek restitution).  (Compl. ¶¶

64-67.)

Section 8-307 does not provide plaintiffs the remedy they seek.  The full text of that

---

[7]  To the extent plaintiffs' implied covenant claim is a roundabout attempt to assert a
fraudulent inducement claim against defendants, such a claim was previously dismissed by this
Court because, inter alia, plaintiffs had abandoned the claim.  <u>See</u> <u>Waxman</u>, 2003 WL 22439796,
at *12.  Plaintiffs may not reassert the fraud claim in the guise of a breach-of-contract claim,
implied or otherwise.

section is as follows:

> Unless otherwise agreed, the transferor of a security on due demand shall supply the purchaser with proof of authority to transfer or with any other requisite necessary to obtain registration of the transfer of the security, but if the transfer is not for value, a transferor need not comply unless the purchaser pays the necessary expenses. If the transferor fails within a reasonable time to comply with the demand, the purchaser may reject or rescind the transfer.

The duty imposed by that section is solely a duty to "supply the purchaser with proof of authority to transfer" or with "any other requisite necessary to obtain registration of the transfer of the security," not a duty to transfer the security itself. Of course, any time a party fails to transfer a security to another party under a contract, that party will invariably have failed to transfer the incidents of registration and ownership of that security. However, if the drafters of the U.C.C. intended to create a broad rescission and restitution remedy for any failure to transfer a security, they could have done so directly, not in a roundabout fashion by creating a remedy for the failure to supply "proof of authority to transfer" or other incidents of registration and ownership. This reading is buttressed by the official commentary, which reflects the drafters' specific concern with the proper registration of the transfer of securities, and not with enforcing the transfer of securities itself. See Official Comment No. 1 to § 8-307 ("Because registration of the transfer of a security is a matter of vital importance, a purchaser is here provided with the means of obtaining such formal requirements for registration as signature guaranties, proof of authority, transfer tax stamps and the like."). Finally, plaintiffs cite to no case that supports their reading of section 8-307 as providing a statutory cause of action for rescission and restitution damages under these circumstances. (Pl. Mem. 18-19.) Once again, plaintiffs' attempt to obtain a better deal for themselves than they negotiated fails. Plaintiffs' second claim for relief is thus

dismissed.    In addition to moving for summary judgment on plaintiffs' claims, defendants also move for summary judgment with respect to their conversion and unjust enrichment counterclaims, both of which concern the four JP Morgan accounts.  Defendants' motion as to these counterclaims is granted in part and denied in part.

Defendants allege that plaintiffs deprived EPPSI of the funds in the JP Morgan accounts – by locking EPPSI out of the accounts and using the funds therein to pay a variety of MetroMining's and Waxman's expenses – even though the documents governing the sale of MetroMining to EPPSI transferred these funds to EPPSI, and EPPSI was making use of these accounts after the Closing.  Thus, defendants argue that plaintiffs are liable for the balance in those accounts as of March 21, 2002, the date on which Waxman locked EPPSI out of the JP Morgan accounts, on either a conversion or unjust enrichment theory.  See Hart v. City of Albany, 706 N.Y.S.2d 535, 536 (3d Dep't 2000) (conversion is "any unauthorized exercise of dominion . . . over property by one who is not the owner of the property [and] which interferes with . . . a superior possessory right"); Kaye v. Grossman, 202 F.3d 611, 616 (2d Cir. 2000) ("To prevail on a claim for unjust enrichment in New York, a plaintiff must establish 1) that the defendant benefitted; 2) at the plaintiff's expense; and 3) that equity and good conscience require restitution . . . ." (quotation marks omitted)).

Plaintiffs contend that defendants' conversion claim is defective for the following reasons:  (1) because EPPSI failed to transfer the 550,000 depositary receipts due in exchange for the sale of MetroMining under the Sale Agreement, EPPSI obtained no "right," superior or otherwise, to any of MetroMining's assets, including the funds in the JP Morgan accounts (Pl. Mem. at 20-21, 24); (2) assuming that some of the funds in the JP Morgan accounts were

converted, those funds are not "specifically identifiable" and cannot be segregated from funds

that were not converted, barring recovery under New York law (Pl. Mem. at 21); (3) defendants'

tort counterclaims are merely breach-of-contract redux (Pl. Mem. at 22); and (4) plaintiffs made

over $315,000 in payments to creditors that EPPSI was required to pay using MetroMining's

cash, and this amount outweighs the $244,000 that defendants claim was in the JP Morgan

accounts (Pl. Mem. at 23-24).  As to the unjust enrichment claim, plaintiffs make essentially the

same arguments.  (Pl. Mem. at 24.)  In the end, these arguments are unpersuasive.

Plaintiffs' first argument, that EPPSI never obtained the right to the JP Morgan account

funds because it never transferred the 550,000 depositary receipts due in exchange for

MetroMining's assets, has some merit.  As plaintiffs point out, the Sale Agreement specifically

states that "*[u]pon payment of the Purchase Price* . . . the sale, transfer, conveyance assignment

and delivery by MetroMining and Waxman of [MetroMining's assets] shall be effected" (Sale

Agreement § 1.3(a) (emphasis added)), and defendants concede that the "Purchase Price," the

550,000 depositary receipts, was never transferred.  However, that provision of the Sale

Agreement goes on to say that the transfer of MetroMining's assets shall be effected "by

MetroMining's and Waxman's execution and delivery of one or more deeds, bills of sale,

assignments, and other instruments of conveyance and transfer" (id.), and it is undisputed that on

or about the date of the Closing, a Bill of Sale *was* executed that purports to transfer

MetroMining's assets to EPPSI.[8]  Further, defendants point out that the very next provision of

_____

[8]  The Bill of Sale states:

KNOW ALL MEN BY THESE PRESENTS that, for value
received [MetroMining], a New York corporation ("Seller"), has
granted, conveyed, assigned, transferred and set over and by these

the Sale Agreement states, without limitation, that "[a]t the Closing, MetroMining and Waxman shall collectively sell, transfer, convey, assign and deliver to [EPPSI] fee simple absolute title to and exclusive possession of all of the Purchased Assets free and clear of any Liens" (Sale Agreement § 1.3(b); see also Def. Mem. at 6), which appears to be exactly what occurred.

To the extent that the Court might be able to discern some ambiguity as to whether the parties intended that defendants would (and did) obtain the right to MetroMining's assets as of the Closing and upon execution of the Bill of Sale, plaintiffs' failure to address these points is dispositive. For instance, the transfer accomplished by Bill of Sale "is subject to the terms and conditions of the [Sale Agreement]," which presumably includes the "upon payment" language in section 1.3(a) of the Agreement. (Bill of Sale at 1.) However, it cannot be said that this language signifies that plaintiffs intended that the transfer of MetroMining's assets would be effected only upon defendants' transfer of the depositary receipts, or even that there is a genuine issue of material fact on this point, where plaintiffs completely fail to address the import of the Bill of Sale in their papers.

Plaintiffs' second argument, that the funds that were allegedly converted are not "specifically identifiable" as is required to maintain a conversion action for money under New York law, Republic of Haiti v. Duvalier, 626 N.Y.S.2d 472, 475 (1st Dep't 1995), is without merit. Plaintiffs argue that the funds that were allegedly converted are not specifically

_____

presents does grant, convey, assign, transfer and set over to [EPPSI], a Delaware corporation ("Buyer"), all of its right, title, interest and any associated goodwill in those assets of Seller (the "Purchased Assets") described as being acquired by Buyer in Section 1.1 of [the Sale Agreement.]

(Bill of Sale at 1.)

identifiable because "the parties willingly commingled their money – [MetroMining] put money into the accounts . . . and [EPPSI] apparently alleges, but has failed to show, that [EPPSI] put money into the account[s] also. There has been no accounting as to how much each party put into the account and how much money was paid out of the account for each party's benefit." (Pl. Mem. at 21.) However, it makes no difference how much of which money was in the accounts. It is undisputed that any money deposited by EPPSI or on EPPSI's behalf into the accounts, representing post-Closing revenues of EPPSI, belonged to EPPSI. (Waxman Dep. at 93-94; Pl. Statement ¶ 24; Pl. Mem. at 21-22.) And the Sale Agreement makes clear that "all amounts due and owing to MetroMining or Waxman of whatever description as of the Closing Date" (Sale Agreement § 1.1(a)), and "all cash or cash equivalents in the possession of MetroMining as of the Closing Date" (id. § 1.1(j)), were among the assets to be transferred to EPPSI. While EPPSI was to use MetroMining's accounts receivable and cash to first pay off certain of MetroMining's debts – defined as "Deposits Payables" and "Trade Payables" in the Sale Agreement (id. § 1.2(a)), that is relevant only to what EPPSI was required to do with these assets once it obtained them, not to the question of whether EPPSI obtained these assets under the Agreement in the first place. Thus, all the money in the JP Morgan accounts are properly the subject of defendants' conversion counterclaim.

Third, plaintiffs argue that defendants' conversion counterclaim is simply a breach-of-contract claim by another name, and is defective for that reason. See Peter Griffin Woodward, Inc. v. WCSC, Inc., 452 N.Y.S.2d 599, 600 (1st Dep't 1982) (noting that an "action for conversion can not be validly maintained where damages are merely being sought for breach of contract"). However, defendants' theory is not that plaintiffs failed to transfer the funds in the JP

Morgan accounts to EPPSI at the time specified in the Agreement, which would undoubtedly be an action for breach of contract and not for conversion, but rather that after the transfer of these funds was consummated (at which point, because the accounts were still in MetroMining's name, Waxman was acting merely as a bailee of EPPSI's cash), Waxman locked EPPSI out of the accounts and refused EPPSI's demand for the cash. (Def. Mem. at 5-8.) Once again, plaintiffs make no response to these contentions (aside from the blanket response that the funds were always "MetroMining's money" because of section 1.2(a) of the Sale Agreement, an argument rejected above).[9]

Plaintiffs' final argument is that defendants' counterclaims fail because plaintiffs used the funds in the JP Morgan accounts (or their equivalent) to pay off numerous MetroMining payables that EPPSI failed to pay off, and which amounted to more than $315,000, far in excess of the $244,000 defendants claim was in the JP Morgan accounts. Defendants respond first by arguing that EPPSI's obligation under the Sale Agreement to use the funds in the JP Morgan accounts to first pay off any or all of these payables is irrelevant to its counterclaims. (Def. Mem. at 11-12; Reply Mem. at 11.) However, if plaintiffs used the funds in the JP Morgan accounts to make payments required of EPPSI under the Sale Agreement, but which EPPSI failed to make, then the amount of these payments, while irrelevant to plaintiffs' threshold liability, is relevant to the *damages* defendants are entitled to. That is not to say that all of the payments identified by plaintiffs in their papers fit this description. (Pl. Mem. at 10-11;

---

[9] And in any event, even if defendants' counterclaim were nothing more than a claim for breach of contract, defendants could bring it as such, as it is not clear what if any difference the denomination of the claim would make under the circumstances.

Waxman Decl. ¶ 8.) For instance, as to the $142,348.94 plaintiffs claim was paid by plaintiffs on behalf of EPPSI for post-Closing moving expenses, and which plaintiffs subsequently reclaimed from the JP Morgan accounts, it is undisputed that such payment was made on behalf of EPPSI and thus was not a MetroMining payable covered by section 1.2(a) of the Sale Agreement. More importantly, however, defendants point out that the only evidence of such payment relied on by plaintiffs – a November 21, 2001 letter from Waxman to Bhajun Santchurn – indicates that the payment was itself made out of the JP Morgan accounts, the funds in which, as previously discussed, belonged to EPPSI subject only to the limitations of section 1.2(a) of the Sale Agreement. (Herrmann Decl., Ex. K, at 1; Reply Mem. at 11-12.) If so, plaintiffs had no right to reimburse themselves for a payment that was initially made with EPPSI's money.

Second, plaintiffs claim that EPPSI was required under section 1.2(a) of the Agreement to pay $99,050 to Thelen, Reid & Priest for MetroMining's legal fees in connection with the sale of MetroMining to EPPSI, and $10,000 to Shipman & Goodwin for MetroMining's pre-Closing legal fees in connection with a lawsuit denominated the "Tomra" litigation. In fact, the Sale Agreement flatly belies EPPSI's obligation to make either of these payments. As for the $10,000 legal fee incurred in relation to the Tomra litigation, section 1.4 of the Sale Agreement states specifically that "[n]otwithstanding any provision in this Agreement to the contrary," MetroMining, not EPPSI, would be responsible for:

> [a]ny and all liability or obligation of MetroMining or Waxman in connection with any litigation (whether legal, administrative or otherwise), including legal fees, or alternative dispute mechanism pending or threatened against MetroMining or Waxman with respect to any current or threatened claims and causes of action against third parties including, but not limited to, the [Tomra litigation.]

As for the $99,050 incurred for legal fees in connection with sale of MetroMining, the Sale

Agreement states in section 10.2 that:

> All expenses involved in the preparation, authorization, and
> consummation of this Agreement, incurred up to and including the
> Closing, including without limitation, all fees and expenses of
> agents, representatives, counsel, and accountants in connection
> therewith, shall be borne solely by the party who shall have
> incurred the same and the other party shall have no liability in
> respect thereof.

Plaintiffs all but concede that the Agreement rejects EPPSI's liability for these fees, but

they claim that both Thelen, Reid & Priest and Shipman & Goodman were listed as "payables"

on a document that is alternately described as "schedules accompanying the Contract," or "the

list of payables attached to the Contract," and that "Envipco did not object." (Waxman Decl. ¶

8(c)-(d).) The document referred to by plaintiffs, essentially a 19-page spreadsheet entitled

"Aging Report: Accounts Payable," is not specifically referred to in the Sale Agreement, does

not itself reference the Sale Agreement, and provides no detail as to what the listed payable

amounts represent. (Waxman Decl., Ex. P.) It appears highly unlikely that the parties intended

this document to amend, and indeed negate, the Sale Agreement's express rejection of EPPSI's

liability for these specific legal fees. Cf. A-1 General Contracting Inc. v. River Market

Commodities Inc., 622 N.Y.S.2d 378, 381 (3d Dep't 1995) ("[A] contract should not be

interpreted in such a way as would leave one of its provisions substantially without force or

effect[.]"). Nevertheless, defendants completely fail to address plaintiffs' argument as to the

attached "list" or "schedules" of payables, and the Sale Agreement does indicate that "entire

agreement" between the parties consists not only of the Agreement itself but "the Exhibits and

Schedules and other documents referred to [therein]" (Sale Agreement § 10.6; see also id. §

10.12).  Under the circumstances, defendants are not entitled to summary judgment with respect to these payments,[10] and the question whether or not they can be offset against the amount to be recovered by defendants will be deferred to trial.  The same applies to the remaining payments listed by plaintiffs, which are either ignored by defendants in their moving papers, or on which the Court is unable to rule as a matter of law on the present record.

For the foregoing reasons, defendants' motion is granted as to liability with respect to its conversion counterclaim, but denied as to the question of damages, which will be deferred to trial, to permit the finder of fact to determine the amount of the funds in the JP Morgan accounts, as well as what, if any, payments made by plaintiff out of those funds should be subtracted from defendants' damages.  And of course, the amount of such damages will ultimately be offset against the damages owed to plaintiffs on their breach-of-contract claim.

Finally, because defendants' motion is granted with respect to its conversion counterclaim, it is denied with respect to its unjust enrichment counterclaim, which requests the same relief.  That counterclaim is thus dismissed as duplicative.[11]

II.  Plaintiffs' Cross-Motion for Partial Summary Judgment

          Plaintiffs move for summary judgment as to defendants' liability on their breach of contract claim, to the extent of the 550,000 depositary receipts that were to be provided in exchange for the sale of MetroMining to EPPSI.  (Pl. Mem. at 24.)  Defendants concede their liability for the 550,000 depositary receipts that they failed to transfer (Def. Mem. at 10; Answer

_____

[10]  Plaintiffs do not move for summary judgment with respect to these payments.

[11]  Even if defendants' conversion counterclaim were defective, for essentially the same reasons defendants would be entitled to summary judgment on the liability aspect of their unjust enrichment counterclaim.

to Second Amended Complaint ¶ 66), and plaintiffs motion will thus be granted.[12]

## CONCLUSION

For the foregoing reasons, defendants' motion for partial summary judgment is granted in part and denied in part, and plaintiffs' cross-motion for partial summary judgment is granted. The parties shall appear before the Court for a status conference to be held on Friday, February 17, 2006, at 4:30 p.m.


SO ORDERED.

Dated:     New York, New York
             January 17, 2006

                                            GERARD E. LYNCH
                                            United States District Judge

---

[12] In their reply memorandum, defendants contend, for the first time and in conclusory fashion, that they did *not* breach the parties' agreement by failing to transfer the 550,000 depositary receipts, because "performance of their obligations was excused by Plaintiffs' prior material breach of their own obligations under the parties' entire agreement." (Reply Mem. at 14 (citing Answer ¶ 75)). As an initial matter, defendants fail to explain what this "prior material breach" was. More importantly, defendants' opening memorandum concedes defendants' threshold liability for breach of contract as to the 550,000 depositary receipts, going so far as to state that trial as to the breach of contract claim is appropriate, and that the only issues for trial are "what remedies are Plaintiffs entitled to and what are Plaintiff's damages." (Def. Mem. at 10.) Defendants' contrary argument in reply is too little, too late, and is rejected.

24