UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
                                                            :
HENRY A. WAXMAN and METROPOLITAN                            :
MINING CO., INC.,                                           :
                                                            :
                           Plaintiffs,                      :
                                                            :       02 Civ. 10132 (GEL)
         -v-                                                :
                                                            :       **OPINION AND ORDER**
ENVIPCO PICKUP & PROCESSING                                 :
SERVICES, INC. et al.,                                      :
                                                            :
                           Defendants.                      :
------------------------------------------------------------x

Eugene Killian, Jr., Killian & Salisbury, P.C., Clark, NJ, for plaintiff.

Jeffrey W. Herrmann, McguireWoods LLP, New York, NY, for defendant.

GERARD E. LYNCH, District Judge:

     Plaintiffs Henry A. Waxman and Metropolitan Mining Company, Inc. ("MetroMining"), a company owned by Waxman, commenced this breach-of-contract action against defendants Envipco Pick Up & Processing Services, Inc. ("EPPSI"), Environmental Products Corp. ("EPC"), and Envipco Holding, N.V. to, inter alia, recover the value of 600,000 depository receipts – tradeable securities representing stock of Envipco Holding – which defendant EPPSI had agreed, but failed, to transfer to plaintiffs in exchange for MetroMining's assets and to retain Waxman as an employee. After the close of discovery on August 31, 2004, and after the Court decided the parties' motions for partial summary judgment on January 17, 2006, Waxman v. Envipco Pick Up & Processing Services, Inc., No. 02 Civ. 10132, 2006 WL 236818 (S.D.N.Y. Jan. 17, 2006), the parties jointly requested that in advance of trial, the Court resolve certain

issues concerning the proper method of valuing the depository receipts that EPPSI failed to transfer.[1]

Specifically, under the parties' contract, the depository receipts were required to be transferred according to the following terms:

> 2.2 Receipts Transfer
>
> (a) At Closing (or as soon as practicable thereafter) and subject to Section 2.2(b), [EPPSI] shall cause to be transferred certain freely tradeable depository receipts representing the common stock of Envipco Holding . . . as follows: (i) to MetroMining, a certificate or certificates representing, in the aggregate, 550,000 Depository Receipts . . . in consideration of the transfer of [MetroMining's assets to EPPSI]; and (ii) to Waxman, a certificate or certificates representing, in the aggregate, 50,000 Depository Receipts in consideration for Waxman executing the Employment Agreement (as hereinafter defined).
>
> (b) The parties agree that at Closing, 262,000 of the MetroMining DR's shall be issued in the name of, and be available immediately to, MetroMining (subject to Section 7.7). The remaining 288,000 MetroMining DR's shall be issued in the name of MetroMining and held in escrow for up to one (1) year (the "Escrow Period") pursuant to the terms of the [attached] Escrow Agreement. All the terms of the escrow, including the release or retention of the Escrowed DR's following the Escrow Period, shall be governed by the terms of the Escrow Agreement.

(Waxman Decl. Ex. C, Asset Purchase and Sale Agreement ("APA"), § 2.2.) The Closing occurred on or about October 30, 2001. (Id. Ex. J, October 28, 2001, Envipco Letter, at 1; Pl.

---

[1] While defendants have conceded liability for EPPSI's failure to transfer 550,000 of the 600,000 depository receipts due under the agreement, there is still a factual dispute as to whether EPPSI transferred the remaining 50,000 receipts. (E.g., Pl. Mem. 6-7.) Waxman, 2006 WL 236818, at *2 n.1. While the Court has been asked to determine the value of all 600,000 receipts on this motion, defendants do not concede that they failed to transfer the 50,000 receipts. That liability question is a factual issue to be decided by the jury at trial.

Mem. 4.)[2] The "Section 7.7" restriction on the transferred receipts, referred to in the above quoted section, provides that:

> MetroMining shall not, for a period of two (2) years following the Closing Date . . . transfer, assign, sell, hypothecate or otherwise dispose of the Depository Receipts in whole or in part, without the written consent of [defendant Envipco Holding]; <u>provided</u> that MetroMining may transfer any or all of the Depository Receipts to [Waxman or Waxman's family], provided that the restrictions on sale set forth [above] shall apply to, and be expressly consented to in writing by, such transferee.

(APA § 7.7(a).)

Finally, the Escrow Agreement, which according to Section 2.2 governs the 288,000 receipts that upon (or soon after) the Closing were to be placed in escrow, provides that whether and when plaintiffs would receive these receipts depended on EPPSI's ability to close contracts with certain MetroMining customers on terms equal to or better than those previously secured by MetroMining. If and when those contracts were made, the receipts would be released to plaintiffs. At the end of a year after the Closing, if any receipts remained in escrow (presumably because some contract had not closed, or was not as favorable as the parties expected), those receipts would be returned to EPPSI. (Waxman Supp. Decl. Ex. B, Oct. 30, 2001, Escrow Agreement.)

The two-year restriction period established by section 7.7, and the Escrow Agreement, have given rise to a dispute over the proper method of valuing the receipts for the purpose of

---

[2] Defendants claim that the closing date was actually October 28, 2001, which plaintiffs dispute. The Court assumes for the purposes of this motion that the closing date was October 30, 2001.

determining plaintiffs' damages.[3] To resolve this dispute, the Court must answer the following four questions: (1) Given the two-year restriction on the receipts imposed by Section 7.7, should the value of the depositary receipts be measured as of the "date of the breach" – when EPPSI failed to deliver the receipts to plaintiffs – or as of the end of the two-year restriction period, when plaintiffs would actually be able to sell or transfer the receipts?[4] (2) If the receipts should be valued as of the date of the breach, should the value be the market price of unrestricted Envipco depository receipts on the date of breach, or should it be the market price minus some discount representing the decreased value of the receipts given their restricted status? (3) If the market price should be discounted, how much of a discount is appropriate? (4) If the date of breach is the proper date to determine the value of the receipts, what is that date?

For the following reasons, the Court holds that (1) the value of the receipts should be measured as of the date of breach; (2) a discount from the then-prevailing market price for unrestricted Envipco receipts is appropriate; (3) the amount of the discount is an issue of fact to be decided by the jury; and (4) the date of breach is the date of the Closing, October 30, 2001, for 312,000 of the total 600,000 shares, but that the date of breach as to the remaining 288,000 shares is an issue of fact for the jury, but is no later than October 30, 2002.

---

[3] The Court emphasizes that the only question presented on the present motion is the value of the depository receipts, not the full extent of the damages incurred by plaintiffs due to defendants' breach of contract.

[4] This is a significant issue because between of the closing the parties' contract and the end of the restriction period, the price of the receipts plummeted from .89 euros to .09 euros. (Pl. Mem. 2.)

4

**DISCUSSION**

The first question is whether the value of the depositary receipts should be measured as of the date of the breach – that is, nondelivery of the receipts by EPPSI – or as of the end of the two-year restriction period on the receipts? Under New York law, the value of the depository receipts should be measured as of the date of the breach. See Simon v. Electrospace Corp., 28 N.Y.2d 136, 145 (1971) ("The proper measure of damages for breach of contract is determined by the loss sustained or gain prevented at the time and place of breach . . . . The rule is precisely the same when the breach of contract is nondelivery of shares of stock." (citations omitted)); Lucente v. IBM Corp., 310 F.3d 243, 262 (2d Cir. 2002) (noting that "New York courts are clear that breach of contract damages are to be measured from the date of the breach," and commenting that "[a]lthough [prior cases applying this rule] dealt with stock that was not restricted, we have found no New York cases suggesting that a different rule would apply to restricted stock"); Scully v. US WATS, Inc., 238 F.3d 497, 512-13 (3d Cir. 2001) (holding option to purchase restricted shares of stock were properly valued as of date of breach rather than end of restriction period).

The rule is not only well settled; it is also well reasoned. Valuing the receipts as of the date when EPPSI failed to deliver them reflects the true loss to plaintiffs at the time of breach, and eliminates any speculation concerning how long plaintiffs would have held on to the securities if they had been delivered as promised. For example, the value of unrestricted Envipco depository receipts was .09 euros at the end of the restriction period, but months later it had rebounded to .28 euros. (Pl. Mem. 10.) Defendants, for obvious reasons, assert that the receipts should be valued as of the end of the restriction period, but without clear evidence that

plaintiffs would have sold the receipts at that time, why choose that date over the later one? What if the price were to rise to 2 euros before the conclusion of these proceedings? Should plaintiffs get the benefit of the doubt that they would have held on to the receipts until the price was at its peak? What if the price subsequently plummeted to .01 euro? Choosing between these dates would be an exercise in speculation and would permit one side or the other to benefit from 20/20 hindsight as to the performance of the securities over time. Cf. Oscar Gruss & Son, Inc. v. Hollander, 337 F.3d 186, 196-98 (2d Cir. 2003) (noting that "New York courts have rejected awards based on what the actual economic conditions and performance were in light of hindsight" (quotation marks omitted)); Scully, 238 F.3d at 512-13 (noting that measuring value of option to purchase restricted shares at end of restriction period "is unduly speculative because it presumes that the [underlying] shares would be sold immediately at the end of the restricted period").

The conclusion that the receipts should be valued at the time of the breach does not mean that the market price of *unrestricted* Envipco depository receipts at the time of breach is the appropriate measure of damages. The general rule is that the market price of a security should be discounted to reflect the decrease in value, if any, due to a restriction on its transferability. See, e.g., Simon, 28 N.Y.2d at 147 (noting in dicta that if stock at issue was restricted (which it was ultimately held not to be), "then the market price would have to be discounted in some way"); Scully, 238 F.3d at 513-14 (noting validity of argument that value of restricted stock would have to be lower than the value of unrestricted stock to account for decreased marketability, and citing cases applying discount). However, defendants' argument that the discount is necessarily 100% because the receipts were valueless at any point prior to the end of

6

the restriction period holds no water. (Def. Mem. 8.) While they could not be transferred, the receipts had intrinsic value corresponding to the expected value of unrestricted receipts at the end of the restriction period (reduced to present value), discounted by interim liquidity risk.[5] For example, no one would contend that a restricted share of the stock of Google, Inc., unrestricted shares of which are currently trading in the open market at around $400, is valueless today because it cannot be sold or transferred until two years from now, although most would agree that it is worth something less than $400.[6]

For this reason, courts and commentators have applied a discount far less than defendants' proposed 100% to account for a security's restricted status. See, e.g., Scully, 238 F.3d at 513-14 (noting defendant proposed 30% discount due to restricted status of stock, but ultimately affirming district court's decision to apply no discount, citing special characteristics of securities at issue); Holmes v. Bateson, 583 F.2d 542, 563 (1st Cir. 1978) (noting expert

---

[5] The hindsight fact that the price of the receipts cratered by the end of the restriction period (from .89 to .09 euros) is irrelevant to the amount of the discount because the extent to which the market, at any previous point in time, anticipated that drop or perceived the risk of such a drop, would of course have been factored into the market price of the receipts. However, to the extent that the pricing history of Envipco receipts demonstrates that they are in general volatile securities, that would increase the illiquidity risk as to the receipts, and might increase the proper discount amount.

[6] The Court observes that it is unclear that the receipts were entirely illiquid during the restriction period. First, the very terms of the restriction provision, section 7.7(a) of the parties' contract, indicates that the receipts could be sold, transferred, or hypothecated upon written consent of defendant Envipco Holding, and it would be a factual question how likely or unlikely it would be that such consent would be given. (Plaintiffs contend that Envipco's CEO indicated that consent to hypothecate the shares would freely be given as long as the proposed transaction did not adversely affect Envipco's interests. Waxman Decl. ¶ 22A). Second, it is not clear to the Court that Waxman could not, during the restriction period, sell the future right to the receipts as of some point after the restriction period ended, and thereby immediately convert the receipts into usable funds.

determined that unregistered stock – which cannot be sold for a certain period of time – was subject to 30% discount); In re Colonial Realty Co., 226 B.R. 513, 523-24 n.11 (Bankr. D. Conn. 1998) (citing authorities that 35% is an appropriate marketability discount on restricted stock of a public corporation); Mandelbaum v. Comm'r of Internal Revenue, T.C. Memo 1995-255, 1995 WL 350881 (Tax Ct. 1995), aff'd, 91 F.3d 124 (3d Cir. 1996) (using as a benchmark petitioner's 10 studies showing that the "average marketability discount for a public corporation's transfer of restricted stock is 35 percent"); Russell T. Glazer, Understanding the Valuation Discount for Lack of Marketability, The CPA Journal (August 2005), available at http://www.nysscpa.org/printversions/cpaj/2005/805/p60.htm (noting restricted stock studies have found average discounts for lack of marketability in the range of 30%-35%, and noting factors impacting amount of discount, including size of company's dividends, size of revenues, size of earnings, revenue and earnings growth and stability, product and industry risk, and length of period of illiquidity); cf. Sowell v. Butcher & Singer, Inc., 926 F.2d 289, 300 (3d Cir. 1991) (noting that "while the fact that a stock is unregistered will have an impact on its value, the lack of registration does not automatically reduce the value of the stock to zero"). Of course, the precise discount that applies in any particular case, including this one, depends on the facts of that case, including expert testimony on the question of the proper discount amount considering the characteristics of the company at issue and the precise nature of the restrictions involved.[7] For that reason, the Court cannot now say what the proper discount amount should be for the

---

[7] Because it is a fact-based inquiry, there may be cases where the facts show that the proper discount is in fact 100%. See, e.g., Propper v. Comm'r of Internal Revenue, 89 F.2d 617, 619 (2d Cir. 1937) (holding that for tax purposes restricted stock had no ascertainable value where evidence, including "ample expert testimony," reflected that restricted shares had nominal value at best).

8

Envipco receipts at issue in this case – that question is for the jury at trial after a review of all the relevant evidence.[8]

The final issue is the date of breach, which turns on when EPPSI was required to transfer the depository receipts to plaintiffs. Plaintiffs contend that the date of breach was October 30, 2001, the date of the closing. They seize on language in the parties' agreement that EPPSI was required to deliver the depository receipts "[a]t Closing (or as soon as practicable thereafter)" (APA § 2.2(a)), and contend that defendants had no reason (or at least no good reason) to delay delivery past the date of the closing. (Pl. Mem. 13-15.)

Defendants respond that the parties' contract was "modified" by two letters from Envipco Holding to plaintiff Waxman – apparently provided to him on the date of the closing after the parties had executed the contract – which stated that EPPSI would deliver the 600,000 receipts within 90 days of the closing, or by January 28, 2002. (Def. Mem. 4-5; Waxman Decl. Exs. I-J.) Plaintiffs state that Waxman "accepted the letters" (Pl. Mem. 6), by which they appear to mean that he received them and, at most, orally agreed that the receipts could be delivered within 90 days of the closing. However, defendants do not contend, and there is no evidence, that

---

[8] The Court notes that because the parties' dispute as to the method of valuing the depository receipts surfaced only after discovery closed, the record may not contain evidence from which a jury could determine the proper discount. In Rochez Bros., Inc v. Rhoades, the Third Circuit encountered this exact problem. It held that where "[t]he only facts . . . were the actual restrictions on the stock and the over-the-counter and asked prices of unrestricted . . . stock," the evidence was insufficient to determine a proper discount. It further held that the burden of this failure of proof fell on the plaintiff's shoulders, because "[t]he plaintiff has the burden of proving every element of his case, including damages that flowed from the alleged injury." 527 F.2d 891, 894 (3d Cir. 1975). Despite this fact, the Court did not penalize plaintiff, but rather elected to give it a second chance to produce evidence on the subject, holding that "substantial justice" so required. Id. at 895. If, before or at trial, it becomes apparent that the record is similarly insufficient to determine the proper discount on the Envipco receipts, the Court will determine the appropriate remedy in light of Rochez and other pertinent authorities.

Waxman agreed in writing to a 90-day extension, and the letters themselves are not countersigned by him. That being the case, plaintiffs contend – and are correct – that the letters, or any oral agreement that they were intended to memorialize, did not modify the delivery deadline stated in the parties' contract. See APA § 10.3 (stating that "[t]his Agreement may not be changed or terminated orally. No waiver of compliance with any provision or condition hereof, and no consent provided for herein shall be effective unless evidenced by an instrument in writing duly executed by the party hereto sought to be charged with such waiver or consent").[9] Because defendants do not assert any other valid reason why delivery of the receipts was delayed past the date of the closing, the date of breach – subject to the caveat below – was October 30, 2001.

However, defendants make a second argument. As previously discussed, 288,000 of the 550,000 receipts due in exchange for MetroMining's assets were not to be delivered to plaintiffs immediately, but rather were to be placed in an escrow account. (APA § 2.2(b); Waxman Supp. Decl. Ex. B.) Thereafter, plaintiffs would become entitled to those receipts if and when EPPSI made certain contracts with former clients of MetroMining, but only if such contracts were made within one year of the Closing. Defendants do not contend that these performance goals were never achieved, and thus that plaintiffs never became entitled to some portion of the 288,000 depository receipts,[10] but rather claim that plaintiffs only became entitled to these receipts at the

---

[9] Defendants' sole argument is that the letters modified the parties' contract. They do not contend that the letters from Envipco to Waxman somehow serve as evidence of when it was "practicable," under the parties' contract, to deliver the receipts.

[10] Such an argument is of course foreclosed by defendants' prior concession that EPPSI is liable for the failure to deliver to plaintiffs all 550,000 of these receipts. See Waxman, 2006 WL 236818, at *13; see also Def. Mem. 10 & n.4 (noting that "it is undisputed that EPPSI never

10

conclusion of the one-year escrow period, noting that there is no evidence that these receipts would have been available to plaintiffs any time sooner than that, which the Court takes to mean that the conditions on plaintiffs' entitlement to the receipts, spelled out in the escrow agreement, were satisfied only at the conclusion of the one-year holding period. (Def. Mem. 5-8 & n.3.)

Plaintiffs respond that the fact that the parties agreed that the receipts would be placed in escrow is irrelevant to determining the date of breach, and they point out that EPPSI never actually placed any shares into escrow, or appointed an escrow agent, so the Court should simply overlook the escrow agreement. This the Court will not do. Regardless of the nature of defendants' breach of the main contract or escrow agreement, the fact of the matter is that under the escrow agreement, which like the main contract was duly signed by both sides, delivery of the shares placed into escrow to plaintiffs was conditional. For that reason, plaintiffs did not become entitled to, and thus defendants did not fail to deliver, those shares until the conditions were satisfied. Cf. 17 Richard A. Lord, Williston on Contracts § 51:45 (4th ed. 2003) (noting that seller loses property interest in stock held in escrow only when consideration from buyer has been rendered). However, this does not mean that defendants are correct that the date of breach for these 288,000 shares is one year after the closing. Plaintiffs contend that at the very latest, all of the conditions in the escrow agreement for release of the receipts to plaintiffs were satisfied by May 2002, citing a May 15, 2002, letter from plaintiff Waxman to Envipco Director Neil Turpie. (Reply 6-7; Waxman Supp. Decl. Ex. C.) In the end, determining when plaintiffs became entitled to the shares that were to be held in escrow is a matter of fact for the jury at trial. So while the date of breach for 312,000 ((550,000 - 288,000) + 50,000) of the receipts is October

---

delivered [the] 550,000 DRs to Metro Mining").

30, 2001, the date of breach for the remaining 288,000 receipts is an issue of fact for the jury, but is no later than October 30, 2002.

## CONCLUSION

For the following reasons, the Court holds (1) that the value of the Envipco depository receipts should be measured as of the date of breach; (2) that the value of the receipts is the market price for unrestricted receipts minus a discount to take into account the decrease in value due to the receipts' restricted status; (3) that the amount of the discount is a factual matter for the jury at trial; and (4) that the date of breach for 312,000 of the receipts is October 30, 2001, but that the date of breach for the remaining 288,000 receipts is a matter of the jury at trial, but is no later than October 30, 2002.

SO ORDERED.

Dated: New York, New York
June 28, 2006

*/s/ Gerard E. Lynch*
GERARD E. LYNCH
United States District Judge